UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION OF THE UNITED STATES FOR AUTHORIZATION TO CONTINUE TO OBTAIN LOCATION DATA CONCERNING CELLULAR TELEPHONE ASSIGNED CALL NUMBER 617-230-9796 AND IMSI 310260008719256 | ) M.J. Docket No. 14-mj-4440-DHH ) ) AFFIDAVIT IN SUPPORT OF ) APPLICATION ) ) **FILED UNDER SEAL** |

AFFIDAVIT OF MARK J. CONCANNON

I, Mark J. Concannon, Special Agent, a Task Force Officer with the U.S. Drug Enforcement Administration ("DEA") being duly sworn, depose and state:

1. I am a Massachusetts State Police Trooper assigned to the Division of Investigative Services, Narcotics Unit, and I have been assigned as a Task Force Officer ("TFO") with the DEA since October 2012. I am currently assigned to the DEA Boston Tactical Diversion Squad located in Boston, Massachusetts. I am a graduate of the Massachusetts State Police Academy and have been a police officer since 2005.

2. As a DEA TFO, I am an investigative or law enforcement officer of a State, within the meaning of 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations for offenses enumerated in 18 U.S.C. § 2516, which include violations of federal narcotics laws in violation of Title 21 of the United States Code. In 2003, I graduated from the Massachusetts Criminal Justice Training Council basic reserve intermittent academy. In 2005, I graduated from the Massachusetts State Police Academy. As a Massachusetts State Trooper, I was initially assigned to patrol out of the Danvers and Norwell Barracks, and then to the Community Action team in the city of Brockton working in a high crime area focusing on gang and drug activity. In October of 2012, I was re-assigned to the Division of Investigative Services and assigned to the

DEA working as a task force officer in the Boston Tactical Diversion Squad. I have a Bachelors of Science degree in Criminal Justice from the University of Massachusetts, Lowell. I have attended numerous narcotics investigation courses, including a two week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

3.     My duties include, but are not limited to, the investigation of narcotics violations and offenses. In the course of performing these duties as a state police officer, I have been involved in narcotics purchases as an undercover officer. I have participated in various aspects of narcotics investigations including controlled purchases, undercover purchases, and surveillance. I have been involved in over 200 narcotics investigations leading to arrests which included heroin, cocaine, marijuana, oxycodone, and other controlled substances. Through my training and experience, I am familiar with the appearance, packaging, texture, and smell of many controlled substances. I am familiar with the terminology used by both narcotics users and distributors of controlled substances and the manner in which they disguise the subject of their conversations and operations. I have participated in joint investigations with the DEA, Federal Bureau of Investigation ("FBI"), and numerous state and local agencies. On the basis of my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations. I am also familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

## PURPOSE OF THIS AFFIDAVIT

4.     I submit this affidavit in support of an application for an order pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c)(1)(A), authorizing agents of the DEA to

continue to ascertain the physical location including but not limited to E-911 Phase II data (or other precise location information) (the "Requested Information"),[1] for a period of thirty (30) days for a T-Mobile cellular phone assigned phone number 617-230-9796, bearing International Mobile Subscriber Identity ("IMSI") number 310260008719256, subscribed to "Bob Bob," at 14 Allstate Road, Dorchester, MA 02124, and used by Juan PENA (hereinafter, the "Target Telephone").  Agents initially began receiving the Requested Information pursuant to a warrant issued by the Honorable David H. Hennessy on December 18, 2014 in case number 14-mj-4440-DHH.  This order is set to expire on January 17, 2015.

5. I have personally participated in the investigation set forth below.  I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by other agents of the DEA, and other state and local law enforcement agencies. Since this affidavit is being submitted for the limited purpose of securing an order authorizing the acquisition of the Requested Information, I have not included details of every aspect of the investigation.   Facts not set forth herein are not being relied on in reaching my conclusion that there is more than sufficient evidence to support the issuance of the requested order.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

6. Probable cause exists to believe that the Requested Information will constitute or lead to evidence of offenses by Juan PENA, Eudy VICTORINO and unknown others (collectively the "Target Subjects") involving 21 U.S.C. § 841(a)(1) (distribution of controlled substances) and

---

[1]  Such information may, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the Target Telephone at the start and end of any call.

3

21 U.S.C. § 846 (conspiracy to distribute controlled substances) (collectively the "Target Offenses"), as well as the identification of individuals who are engaged in the commission of these offenses.

7. For the reasons set out in this affidavit, I believe that the Requested Information is relevant to the ongoing investigation of the Target Subjects. Additionally, I believe specific and articulable facts exist showing that there are reasonable grounds to believe that the Requested Information is relevant and material to an ongoing criminal investigation.

## BACKGROUND OF THE INVESTIGATION

8. Since approximately June 2014, the DEA Boston Tactical Diversion Squad has been investigating PENA, a drug trafficker distributing grams of heroin and bulk quantities of oxycodone pills in the Boston, Massachusetts area. To date, agents have gathered evidence of PENA's drug trafficking activities through various investigative methods, including, but not limited to: physical surveillance, undercover purchases of narcotics from PENA, a review of public and law enforcement records, cellular telephone toll analysis, GPS tracking of a vehicle, and precise location information of PENA's cell phone.[2]

9. As discussed in further detail below, the investigation has revealed that PENA utilizes two cell phones to conduct his drug trafficking activities. I have served as the undercover agent in this case and have personally contacted PENA at both the Target Telephone and 857-317-0653. PENA has indicated that he prefers to be contacted on the Target Telephone, and

---

[2] On September 18, 2014, the Honorable United States Magistrate Judge David H. Hennessy issued a warrant in 14-MJ-4289-DHH authorizing agents to install and monitor a GPS device on PENA's vehicle, a maroon 2004 Jeep Liberty bearing vehicle identification number 1J4GL48K94W148390 and Massachusetts registration number 272ZH4, for 45 days. Judge Hennessy extended the tracking period for this warrant on October 31, 2014 for another 45 day period. Agents ceased tracking the vehicle after PENA lost his driver's license following his November 9, 2014 arrest for operating a vehicle while intoxicated.

that number is the primary number that I have used to contact PENA in this case.

**PROBABLE CAUSE**

10.     On July 10, 2014, I made arrangements in an undercover capacity to purchase approximately 20 grams of heroin directly from PENA for $1,200. In a phone call over the Target Telephone, PENA and I arranged to meet near Prospect Ave in Randolph, Massachusetts. After I arrived in the area, I spoke with PENA on the Target Telephone. In this conversation, PENA instructed me to come to the main road and to follow him into the neighborhood. PENA told me that he wanted to complete the transaction quickly. I followed PENA in his vehicle onto Petipas Lane, and then onto Hollis Street. PENA then parked his vehicle and walked up to my vehicle. PENA provided me with four plastic bags containing brown powder.[3] I gave PENA $1,200. PENA then left the area in his vehicle. After departing, PENA called me, using the Target Telephone to advise me to be careful driving through Randolph center as he had seen several police vehicles in the area. He additionally told me that he (PENA) and I were going to "make . . . a lot of money" if we "keep doing business together." The meeting between me and PENA was audio recorded.[4]

11.     On August 21, 2014, I conducted an undercover purchase of 30 grams of heroin from PENA. On August 21, 2014, I spoke with PENA via the Target Telephone, and arranged to purchase 30 grams of heroin for $1,800. PENA and I agreed to conduct the deal in the area of Petipas Lane in Randolph, Massachusetts. Petipas Lane is in the same neighborhood as PENA's residence and the same location where the July 10, 2014 undercover buy described above took

---

[3]     The plastic bags were sent to the DEA Northeast Regional Laboratory for analysis. The analysis has not yet been completed. Based on training and experience, agents believe that the substance in the baggies was heroin, as agreed with PENA.

[4]     The calls between me and PENA were not recorded.

place. At approximately 6:55 p.m., I arrived in the area as instructed by PENA. I observed PENA parked on the side of the street in his vehicle. I parked my vehicle behind PENA's. PENA then exited his vehicle, approached my vehicle and provided me with 12 plastic bags containing a brown rock-like powder.[5] I paid PENA $1,800. PENA then entered his vehicle with the money and left the area. The meeting was audio recorded.[6]

12. On August 26, 2014, I purchased 200 oxycodone 30 mg pills from PENA. On August 26, 2014, PENA called me using the Target Telephone and told me that he had oxycodone pills for me to purchase, at $26.50 per pill.[7] PENA instructed me to meet him in the area of Orin White Drive, which is in the same neighborhood as the previously detailed buys. When I arrived on Orin White Drive, I saw PENA exit his vehicle, take a few steps towards my vehicle, and then turn around, walk back into his vehicle and begin to drive away. PENA called me using the Target Telephone and told me to follow him into the neighborhood. I followed PENA until he pulled his vehicle over to the side of the road. PENA then walked to my vehicle and provided me with 200 oxycodone pills.[8] I gave PENA $5,300. PENA entered his vehicle with the money and

---

[5] The 12 plastic bags were sent to the DEA Northeast Regional Laboratory for analysis. This analysis is not yet complete. Based on training and experience, agents believe that the bags contain heroin, as agreed with PENA.

[6] The calls between me and PENA were not recorded.

[7] In these conversations, PENA consistently referred to the pills as "those things." Based on training and experience, and previous conversations with PENA, agents understood "those things" as code for 30mg oxycodone pills.

[8] The pills were sent to the DEA Northeast Regional Laboratory for analysis. This analysis is not yet complete. Based on training and experience, agents believe that the pills were 30mg oxycodone pills, as agreed with PENA.

drove away.  Agents subsequently observed PENA circle the neighborhood several times, and it appeared that PENA was conducting counter-surveillance. The meeting was audio recorded.[9]

13. As I was driving away from the meeting with PENA on August 26, 2014, PENA called me using the Target Telephone and asked how long it would take me to "get rid" of the pills that he had just sold me.  I told PENA that it would take me three to four days.  PENA told me to let him know when he was ready for more pills, and that he could provide 200 additional oxycodone pills in the near future.

14. On September 4, 2014, PENA called me using the Target Telephone and told me that he had oxycodone pills for me to purchase.  PENA told me to meet him again in the area of Petipas Lane in Randolph.  Upon arriving at the agreed location, I called PENA on the Target Telephone.  PENA told me to pull over on Petipas Lane.  PENA then arrived and pulled his vehicle over behind mine.  PENA approached my vehicle and handed me a plastic bag containing oxycodone pills.  PENA told me that the bag contained 225 pills.  I handed PENA $5,960.[10] PENA took the money, told me to "be careful," and left the area.  The meeting and calls leading up to the purchase discussed herein were audio recorded, my final call to PENA was not recorded due to concerns that PENA might see the audio recording equipment on me as I approached the meeting location.

15. On September 23, 2014, I conducted an undercover purchase of approximately 30 grams of heroin from PENA.  At approximately 1:15 P.M., I called PENA on the Target

---

[9] The calls between me and PENA were not recorded.
[10] Agents later determined that the bag only contained 150 30mg oxycodone pills.  I called PENA on his other phone number, 857-317-0653, regarding the discrepancy and PENA ultimately returned $1,940.  The pills were sent to the DEA Northeast Regional Laboratory for analysis. This analysis is not yet complete.  Based on training and experience, agents believe that the pills were 30mg oxycodone pills, as agreed with PENA.

Telephone and told PENA I needed "three" of the "brown." Based on my experience in this investigation, including previous interactions with PENA, I understood "three of the brown" to be a coded request for three "fingers" of heroin, or approximately 30 grams of heroin. PENA said, "okay" and asked me what time I wanted to meet. I told PENA I wanted to meet between 6:00 p.m. and 7:00 p.m. PENA said he would let me know if he "came across those other things." Based on my training and experience and the investigation in this case, I believe that PENA was referring to 30 mg oxycodone pills. At approximately 5:56 p.m., PENA called me using the Target Telephone and said he was ready to meet with me. PENA told me to meet him in the area of Petipas Lane, in Randolph. I was delayed, and PENA called me several times using the Target Telephone asking where I was. PENA told me that he "couldn't be driving around with this stuff." Based on my training and experience, and on the observations made during this investigation, I believe that PENA was expressing his concern about traveling for an extended period of time while in possession of illegal narcotics.

16.     At approximately 6:19 p.m., I called PENA on the Target Telephone for instructions regarding the meeting location. I ultimately met with PENA on Burris Way in Randolph, Massachusetts. While speaking to PENA over the Target Telephone, PENA instructed me to "have the money ready" and to "pull up window-to-window." When I did so, PENA gave me twelve plastic bags, each containing a brown rock-like powder. In exchange, I gave PENA $1,800.[11] The meeting and calls leading up to the purchase discussed herein were audio recorded, the final call to PENA was not recorded do to the possibility of the UC being observed by PENA.

---

[11]    The 12 plastic bags were sent to the DEA Northeast Regional Laboratory for analysis. This analysis is not yet complete. Based on training and experience, agents believe that the bags contain heroin, as agreed with PENA.

17.     On October 28, 2014, at approximately 1:31 p.m., PENA called me using the Target Telephone.  I called PENA back at approximately 1:53 p.m. on the Target Telephone and asked if I could purchase heroin from PENA the next day.  PENA said, "Yes, give me a call when you are ready."  On October 29, 2014, I met with PENA and purchased approximately 30 grams of heroin from PENA. The meeting and calls leading up to the purchase discussed herein were audio recorded, the final call to PENA was not recorded due to concerns that PENA might see the audio recording equipment on me as I approached the meeting location.

18.     On November 9, 2014, PENA was arrested by the Boston Police Department for operating a vehicle while intoxicated.  As a result of this arrest, his Massachusetts driver's license has been suspended and PENA is unable to operate a motor vehicle. Because PENA is no longer using a single vehicle to conduct his drug trafficking activities, agents can no longer rely on GPS tracking of his vehicle for his whereabouts during his drug trafficking activities.

19.     On December 10, 2014, at approximately 2:18 p.m., I called PENA on the Target Telephone and made plans to purchase three fingers of heroin (approximately 30 grams) from PENA around six or seven that evening.  At approximately 7:19 p.m., PENA called me using the Target Telephone and asked if I was close.  A short time later I spoke to PENA again on the Target Telephone, and received instructions from PENA to follow a car "taking a right." I observed a white Mercedes bearing MA Registration 942RS1 making a right hand turn onto Petipas Lane.  I followed that vehicle, and then pulled up behind the vehicle.  I saw PENA get out of the passenger side door of the vehicle.  Shortly thereafter, PENA reentered the vehicle and I followed PENA and the vehicle a short distance further down the street.  PENA subsequently exited the passenger side of the vehicle a second time, and walked back to my vehicle.  PENA

entered my vehicle and handed me 12 clear plastic twists containing a brown powder.[12] In exchange I gave PENA $1,800. PENA and I subsequently engaged in conversation in my vehicle. During that conversation PENA asked me if I could send him more customers. After the sale, PENA walked back to the Mercedes in which he had arrived, entered the passenger seat, and departed the area. The meeting and calls leading up to the purchase discussed herein were audio recorded, the final call to PENA was not recorded due to concerns that PENA might see the audio recording equipment on me as I approached the meeting location.

20. On January 13, 2015, at approximately 3:05 p.m., I called PENA on the Target Telephone and made arrangements to purchase 30 grams of heroin. I called PENA on the Target Telephone and asked him if he would be good for "3" (fingers of heroin or approximately 30 grams of heroin). PENA told me he would be "good" and to call him when I was ready and to give him like "2 or 3 hours." In response to PENA's previous request that I bring him more customers, I told him that I was nervous that if I sent him more customers he may not deal with me anymore. PENA told me "we are good," and I would not "lose him." This conversation was recorded.

21. According to pen register data, the Target Telephone was last used on January 15, 2015 at approximately 10:17 p.m.

## AUTHORIZATION REQUEST

22. Based on the foregoing, there is probable cause to believe that the Requested Information will lead to evidence regarding the Target Offenses. The Requested Information will provide investigators with information regarding the sector of the cell phone tower the Target

---

[12] The 12 plastic twists were sent to the DEA Northeast Regional Laboratory for analysis. This analysis is not yet complete. Based on training and experience, agents believe that the bags contain heroin, as agreed with PENA.

Telephone is communicating with, and provide investigators with information regarding the general geographic area in which the user of the Target Telephone resides and operates, including the location where the user of the Target Telephone may transfer the money. The Requested Information is necessary to determine the location of the Target Telephone so that so that law enforcement agents can conduct physical surveillance of the user(s) of the Target Telephone and identify: (1) other potential participants in this ongoing conspiracy to distribute controlled substances, (2) locations used by the Target Subjects, (3) vehicles used by the Target Subjects, (4) financial institutions visited by the Target Subjects.

23. WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents of the DEA to continue to obtain the Requested Information for a period of thirty days.

24. There is "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result." 18 U.S.C. § 3103a(b)(1). Providing prior notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, flee or continue flight from prosecution.

25. The execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. §2703(c)(1)(A).

26. IT IS FURTHER REQUESTED that the Court direct T-Mobile to assist the DEA by providing all information, facilities and technical assistance needed to ascertain the Requested Information, and further direct T-Mobile, the service provider for the Target Telephone, to initiate

a signal to determine the location of the Target Telephone on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the users of the Target Telephone for a period of thirty days. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

27.　　IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

28.　　IT IS FURTHER REQUESTED that the Order apply to any changed telephone number subsequently assigned to the instrument bearing the same IMSI as the Target Telephone, and to any changed IMSI bearing the telephone number of the Target Telephone, within the period of the Court's Order.

29.　　IT IS FURTHER REQUESTED that the warrant and this Affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on DEA and other investigative and law enforcement officers, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and on T-Mobile, as necessary to effectuate the Court's Order.

30.　　IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. §3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of thirty

days after the termination of the monitoring period authorized by the warrant or any extensions thereof.

_____
Mark J. Concannon
DEA Task Force Officer


Sworn to before me this  16  th day of January, 2015.

_____
HONORABLE DAVID H. HENNESSY
United States Magistrate Judge
District of Massachusetts